**FILED**

MAY 2 4 2017

Clerk, U.S District Court
District Of Montana
Great Falls

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

AT&T CORPORATION,

Plaintiff,

vs.

JACKSON UTILITIES, LLC,

Defendant.

**CV-15-39-BU-BMM**

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

The Court heard this matter, sitting without a jury, on December 5-8, 2016, in Butte, Montana. Troy A. Glander and Steven R. Milch represented Plaintiff AT&T Corporation. Patrick M. Sullivan represented Defendant Jackson Utilities, LLC.

Having heard the evidence and reviewed the trial briefs of both parties, the Court makes the following:

### FINDINGS OF FACT

1.      Plaintiff AT&T Corporation ("AT&T") is incorporated in the state of New York with its principal place of business located at One AT&T Way, Bedminster, New Jersey 07470. AT&T is authorized to conduct business in Montana.

2.      Defendant Jackson Utilities, LLC ("JU") is a limited liability company registered in the state of Montana with its principal place of business located at

1

2411 Milkhouse Avenue, Bozeman, Montana 59718. JU is authorized to do business in Montana.

3. The events leading to this lawsuit occurred in Gallatin County, Montana.

4. On July 27, 2015, AT&T brought claims against JU for negligence and negligence per se arising out of damage that AT&T sustained on August 1, 2013, to an AT&T underground long-haul facility, also known as a long-haul fiber optic cable and conduit. AT&T alleged that the damage occurred while JU used a vibratory plow to excavate along the north side of Churchill Road, between its intersections with Anderson Road and Highline Road, Gallatin County, Montana (the "Damage Location").

5. AT&T alleged that JU failed to call in the statutorily required dig-ticket before excavating in the area. AT&T alleged that this failure caused JU to excavate without a valid one-call dig-ticket. AT&T further alleged that despite this failure, AT&T did locate and mark with flags AT&T's facilities at the Damage Location. AT&T further alleged the markings placed by AT&T remained visible to JU and directly conflicted with the path that JU ultimately chose to excavate. In the alternative, to the extent that any of the markings were no longer visible, AT&T alleged that JU negligently failed to call in the statutorily required refresh ticket before excavating.

6.     JU denied that it failed to comply with the statutory obligations that apply to excavators. JU denied that it failed to obtain a one-call dig ticket. JU further denied that it had been negligent.

7.     JU alleged instead that AT&T had failed to locate and mark AT&T's underground facility at the Damage Location as required by the applicable Montana statutes in spite of its receipt of the one-call ticket and its actual knowledge that JU would excavate in that specific area. JU alleged that AT&T's failure to comply with Montana statutory locating requirements and the negligence of AT&T's locator actually caused the damage to AT&T's underground facility.

8.     AT&T and CenturyLink owned underground facilities, as defined by Mont. Code Ann. § 69-4-501(15)(a), that cross near the Damage Location.

9.     Montana Opticom hired Pauley Construction ("Pauley") as the general contractor to install miles of fiber-optic facilities in Gallatin County.

10.     Pauley hired various subcontractors, including JU, to install segments of the fiber-optic facilities.

11.     Pauley hired JU to install the fiber-optic facilities across a span of approximately 8,000 feet that ran along Churchill Road from its intersection with Norris Road to its intersection with Highline Road (the "Project").

12.     Work on the Project began at Norris Road (the southernmost location) and extended northward toward Highline Road.

13.     Montana Opticom hired Kadmus, Lee and Jackson ("KLJ"), an engineering firm, to monitor and document the work performed by Pauley and its subcontractors, among other things. KLJ documented work on the Project on a daily basis.

14.     On June 26, 2013, Pauley placed a call to the one-call notification center and requested the issuance of a one-call ticket. The one call notification center issued a one-call ticket, ticket no. 13049798 (the "Pauley Ticket"), with a work start date of June 29, 2013. The "Location of work" identified in the Pauley Ticket provided as follows: "WITHIN APPROX [sic] 50 FOOT RADIUS OF HOUSE PLUS GOING SOUTHWEST DOWN BOTH SIDES OF ANDERSON RD. APPROX [sic] 300 FEET TO INTERSECTION OF CHURCHILL ROAD AND APPROX [sic] 100 FEET ON NORTH SIDE OF CHURCHILL GOING WEST FROM THE EAST."

15.     AT&T's Al Malin ("Malin") located and marked AT&T's facilities that existed on the north side of Churchill Road in response to the Pauley Ticket. These AT&T facilities started at Anderson Road and crossed over Highline Road. Malin used industry-standard orange flags to demarcate AT&T's telecommunications line.

16.     CenturyLink had contracted with ELM Locating & Utility Services ("ELM") before the Pauley Ticket. ELM agreed to locate and mark CenturyLink's

4

facilities in response to one-call tickets for an area that included the Damage Location.

17.     ELM located and marked CenturyLink's facilities in response to the Pauley Ticket. ELM started at the house referenced above. ELM proceeded southwest down Anderson Road to Churchill Road. ELM then turned west on Churchill Road for 100 feet toward Highline Road. ELM used industry-standard orange flags to demarcate CenturyLink's telecommunications line.

18.     ELM and Malin generally employed differing marking techniques. Malin typically located and marked AT&T's facilities at various locations along the route only where he anticipated that AT&T's facilities would come in conflict with JU's planned excavation work.  Malin did not mark AT&T's facilities continuously. Malin's approach differed from ELM's locating practices of marking CenturyLink's utilities along the entire route.

19.     Dayton Jackson testified that it was not unusual to see AT&T's locate marks stop at one spot and then begin again at another place.

20.     Malin took no photographs of his locate marks along Churchill Road in response to the Pauley Ticket. ELM followed its usual practice of photographing the locate marks in response to the Pauley Ticket. JU's retained expert, Walt Kelly, testified that taking photographs after marking comports with the industry standard to document the work.

21.    JU placed a call to the one-call notification center on July 17, 2013, to request the issuance of a one-call ticket.  The one-call notification center issued a one-call ticket, ticket no. 13057738 (the "JU Ticket"), with a work start date of July 20, 2013.  The "Location of work" identified in the JU Ticket started at Churchill Rd. with the nearest intersecting street of Norris Road and detailed as follows: "EXCAVATION SITE IS ON THE E SIDE OF THE ROAD. LOCATED 4000FT N OF THE INTERSECTION. MARK 4000FT N OF THE EAST ROAD RIGHT OF WAY. AREA WILL BE MARKED WITH WHITE FLAGS."

22.    AT&T received the JU Ticket on that same day.

23.    Malin testified that, in response to the JU Ticket, he marked 4,000 feet going north from the intersection of Churchill Road and Norris Road. He interpreted the JU Ticket as beginning at the intersection of the two roads and stopping at a point 4,000 feet north of the intersection.

24.    Malin did not locate the area between Anderson Road and Highline Road in response to the JU Ticket due to his view that the route described in the JU Ticket terminated at a point 4,000 feet north of the intersection of Churchill Road and Norris Road.

25.    ELM responded to the JU Ticket on behalf of CenturyLink.  Rainor Kjelsrud (a brother of two JU employees) served as the locator for ELM. Kjelsrud testified that the JU Ticket covered the area that began at a point 4,000 feet north

6

of the intersection of Churchill Road and Norris Road, and extending north another 4,000 feet from that point. As he explained, "I would go 4,000 feet from the intersection [Churchill and Norris] and start locating from there and then go an additional 4,000 feet."

26.     ELM's records do not indicate whether ELM located between Anderson Road and Highline Road. Kjelsrud testified that he did not complete the JU Ticket response due to time constraints. Kjelsrud admitted that he did not locate the CenturyLink facilities past Anderson Road, despite what he conceded as the clear instruction in the JU Ticket to do so. Kjelsrud further testified that he spoke directly with JU crew employees who confirmed the proposed route.

27.     Both AT&T's and JU's retained experts testified that they understood the JU Ticket similar to how Rainor Kjelsrud interpreted it.

28.     AT&T's retained expert, Shane Linse, testified that the ticket "says that the work is going to start 4,000 feet north of [the] intersection [of Churchill and Norris]. . . . [S]o if you went from Churchill and Norris Road, and you went 4,000 foot north, you should – according to this ticket, you should see an area marked with white flags, and that's where I would locate it." When questioned by defense counsel, if then he would "mark 4,000 feet north. So, at that point you'd go 4,000 feet north; is that correct?" Linse answered, "Uhm, yes."

29.     JU's retained expert, Walt Kelly, testified that upon examining the JU

Ticket, "I determined that the location started on Churchill Road, approximately 4,000 feet north of the Norris Road, and continued going north to about 500 feet past the Highline Road."

30.    KLJ staked the planned route of excavation along Churchill Road, starting at its intersection with Norris Road and moving north on July 22, 2013.

31.    A representative of JU drove the route staked by KLJ along Churchill Road starting at Norris Road and moving north.

32.    JU performed excavation work along Churchill Road starting at Norris Road and moving north. JU experienced delays in completing the work, however, as other projects took their manpower. As a result, JU did not complete the excavation work on Churchill Road around its intersection with Anderson Road until about two weeks after having called in the JU Ticket on July 17, 2013.

33.    Malin spoke with representatives of JU and KLJ in connection with the excavation activities on Churchill Road before August 1, 2013. The JU and KLJ representatives informed Malin that JU would be excavating all the way to Highline Road. Thus, the information imparted from the JU employees to Malin provided him with direct knowledge of JU's activity in the Damage Area, separate and apart from the information contained in the JU Ticket. This information should have clarified any ambiguity about JU's proposed work area contained in the JU Ticket.

34.     Malin testified that he was present on July 24, 2013, when JU performed the bore under Anderson Road north of Churchill Road. Malin confronted the JU employees about working in the area without what he perceived to be a valid one-call ticket.

35.     Malin testified that the JU employees responded that they possessed a valid ticket to perform the work. Malin recalled that the JU employees relied for authorization for the excavation work either through the Pauley Ticket or the JU Ticket. Malin claims to have refreshed the flags that he had placed for the Pauley Ticket between Anderson Road and Highline Road at that time.

36.     JU bored from a point southeast of Anderson Road to a point northwest of Anderson Road.

37.     Dayton Jackson served as the foreman of the JU crew that was excavating along Churchill Road toward Highline Road.

38.     Jackson was present with the crew on the morning of August 1, 2013. The crew included JU employees Aaron Notarius and Sven Kjelsrud.

39.     Jackson left Notarius and Sven Kjelsrud to use the vibratory plow to excavate from the location of the bore just northwest of Anderson Road over to Highline Road.  Neither Notarius nor Sven Kjelsrud ever had operated the vibratory plow. Jackson gave Sven Kjelsrud some instruction on how to use the vibratory plow. Jackson instructed Notarius to be on the ground to look out for

potential problems.

40. Notarius testified that "the flags that were there that day struck concern in me." He said he was concerned about the two flags that "jumped the road," referring to the dirt path that ran north of, and parallel to, Churchill Road between Anderson Road and Highline Road.

41. Notarius testified that as far as he could tell "there was no way to know" whether any of the flags that were "going along the fence" marked the same utility that was marked by the flags in the "line going along the other side of the [dirt] path."

42. Notarius explained that he remembered "thinking that it was very strange that there was a line of flags along the fence" and then "two flags on the other side of this path, and then they just stopped. It was like lines don't just stop in the middle of a field along the side of the road." He testified that "[i]t didn't make sense . . ."

43. Ken Kiefer of KLJ testified that he also saw the flags south of the excavation path. Kiefer contradicted Malin's claim of having refreshed the flags south of the excavation path on July 24, 2013. In fact, Kiefer characterized the flags as being bent and laying on their sides.

44. Kiefer further noted the inconsistency in the distance between the flags. Kiefer observed that the flags failed to mark the path clearly. Kiefer

mistakenly assumed that JU had talked to AT&T about ambiguous flags. Kiefer explained that his job required him simply to observe and document what he saw, and nothing more.

45.　Notarius testified that he called Jackson before they started using the vibratory plow in the Damage Location due to his concern about the confusing flags. He told Jackson that "we need to check this out a little bit more." Notarius testified that Jackson responded that he "needed guys that were go-getters."

46.　Shane Linse, AT&T's retained expert, testified that, in his experience, the reasonable course of action before digging is to call in the locates and then to "verify everything in the ground" by looking closely at all of the flags.

47.　Sven Kjelsrud continued to operate the plow along the excavation path despite his misgivings about the confusing flags.

48.　At approximately 4:10 p.m., August 1, 2013, the plow operated by JU employees Sven Kjelsrud and Aaron Notarius, struck an underground facility owned by AT&T at the Damage Location. Kjelsrud and Notarius did not know that they had struck the facility. They believed instead that the plow had become stuck. They stopped work for the day with plans to resume work the following morning.

49.　AT&T's equipment received alarms indicating that AT&T's facilities had lost their signal between Bozeman and Three Forks.

50.　AT&T retained Fiberline, Inc., to repair the damaged cable. Shane

Linse of Fiberline brought a crew to the Damage Location on August 2, 2013, to assist with the repairs.

51.  The damaged underground facility consisted of a 192-count fiber optic cable that was approximately 30,208 feet long.

52.  For the permanent repair, AT&T replaced approximately 10,000 feet of the cable and added one field splice to the cable.

53.  Fiberline, Inc. discovered a broken splice vault during the repair process that was located several thousand feet from the Damage Location. The damage to that splice vault appeared to have occurred before August 1, 2013, and appeared to have been unrelated to the damage to the AT&T cable caused by JU's excavation.

54.  AT&T tested the cable after the repairs to the cable had been made. The test results showed that the repaired cable satisfied AT&T's operating requirements and specifications, including attenuation specifications. AT&T approved and accepted the repairs.

55.  Vernan Hogge, JU's retained expert, testified as to the reasonableness of those repairs. Hogge agreed that JU's strike of AT&T's cable required replacement of the 10,000 foot section under the circumstances. These circumstances included the ready availability of the 10,000 foot replacement cable and the ability to add only a single splice.

56.     AT&T mailed a claim for damages to JU at an incorrect address on July 10, 2015. The Claim for Damages stated that AT&T's damages relating to the incident totaled $253,279.34.AT&T requested payment for that amount. JU did not receive the claim until after AT&T filed this action.

57.     AT&T's damages expert, Gerry Harvey, testified during trial that AT&T actually incurred other necessary and reasonable expenses. Harvey testified that those repairs, not included in the initial bill, brought the total expenditures to $284,743.34.

58.     Fiberline invoiced AT&T for a total of $208,566. One of the Fiberline invoices included, however, the unrelated cost to repair the previously damaged splice vault box in the sum of $2,500. The removal of the unrelated $2,500 repair to the splice vault box leaves the total Fiberline repair expenses related solely to the damaged cable at $206,066.

59.     AT&T also produced a bill for the material cost of the replaced cable in the sum of $31,405. JU presented no evidence to challenge the reasonableness of the price for the replacement cable.

60.     The need to add a splice into AT&T's network in order to fix the immediate problem caused by the cable strike created optical loss at the point of the splice. This optical loss proved impossible to eliminate.

61.     The splice also created an increased risk of mechanical failure. The

13

cable at issue had been rated to withstand 600 pounds of tensile force. The cable with the splice case, by contrast, now has been rated to withstand only about 100 pounds of tensile force. Moreover, the splice case sits it an enclosure that remains subject to water intrusion and freezing. Both water intrusion and freezing can negatively impact the performance of the fiber.

62.     AT&T designed this route for only six splices. The addition of the seventh splice has increased the risk of mechanical failure by 15%. AT&T provided no cost estimates to account for the effects of the seventh splice.

63.     AT&T instead has claimed that the best fix would be to replace the entire 30,208 foot cable to eliminate this new seventh splice. Harvey concluded that the total cost of performing the repairs with the complete replacement of the 30,208 foot cable instead of the segmented repair would be at least $386,288.74.

64.     AT&T produced no evidence to establish expenses incurred for FCC Reporting fees or loss of use.

## CONCLUSIONS OF LAW

1.     This Court possesses jurisdiction based upon diversity of citizenship under 28 U.S.C. § 1332, because AT&T is a corporation organized under the laws of the State of New York with its principal place of business located in New Jersey. JU is a limited liability company established under the laws of the State of Montana having its principal place of business in Montana.

14

2.	Venue is proper in the Butte Division of this Court because all or a substantial part of the cause of action arose in Gallatin County, Montana and the Defendant conducts substantial business in Gallatin County.

3.	Negligence involves "the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done." *Kakos v. Byram*, 292 P. 909, 912 (Mont. 1930) (internal citations omitted).

4.	To maintain a negligence action, a plaintiff must prove duty, breach, causation, and damages. *Fisher v. Swift Transp. Co., Inc.*, 181 P.3d 601, 606 (Mont. 2008).

5.	AT&T cannot assert an independent common law negligence claim against JU because the Montana Dig Law, codified at Mont. Code Ann. § 69-4-501 *et seq.*, preempts any common law duties or remedies in these circumstances. The Montana Dig Law imposes statutory duties upon excavators and locators, and provides remedies for damage to facilities. *See* Mont. Code Ann. § 1-1-108 ("In this state there is no common law in any case where the law is declared by statute."); *Meech v. Hillhaven West, Inc.*, 776 P.2d 488, 494-495 (Mont 1989).

6.	AT&T's negligence per se claim persists under the Montana Dig Law. Mont. Code Ann. § 69-4-501 *et seq.* Negligence per se simply involves negligence that is established as a matter of law and usually arises from a statutory violation.

*Giambra v. Kelsey*, 162 P.3d 134, 144 (Mont. 2007) (internal citation omitted).

7.      In Montana, to establish negligence per se, a plaintiff must prove five elements: (1) the defendant violated a particular statute; (2) the statute was enacted to protect a specific class of persons; (3) the plaintiff is a member of that class; (4) the plaintiff's injury is the sort the statute was enacted to prevent; and (5) the statute was intended to regulate a member of defendant's class. *Edie v. Gray*, 121 P.3d 516, 520 (Mont. 2005).

8.      The Montana Legislature enacted the Montana Dig Law to protect underground facility owners such as AT&T from damage to their property, and to protect contractors such as JU from liability for damages. The Montana Dig Law exists to prevent the sort of injury that AT&T suffered in this case. The Montana Dig Law was intended to regulate contractors such as JU. The Court discusses JU's and AT&Ts violations of the Montana Dig Law in more detail below. Negligence per se applies in this case.

9.      Once a plaintiff proves the existence of negligence per se, it still must prove causation in order to recover damages. *Olson v. Shumaker Trucking and Excavating Contractors, Inc.*, 196 P.3d 1265, 1277 (Mont. 2008).

10.     Montana applies modified comparative negligence. *See* Mont. Code Ann. §§ 27-1-702 and -703. Under this doctrine, a claimant whose negligence exceeds the negligence of the defendant recovers no damages. *Id.*; *see City of*

*Whitefish v. Jentile* 285 P.3d 515, 519 (Mont. 2012). If a claimant's negligence equals or falls below that of the defendant, the claimant will recover only the percentage of damages attributed to the defendant. *Id.*

11.     The comparative negligence doctrine applies to a claim for negligence per se. *Giambra*, 162 P.3d at 145.

12.     Mont. Code Ann. § 69-4-503 provides:

(1) Before beginning an excavation, the excavator shall notify, through a one-call notification center, all owners of underground facilities in the area of the proposed excavation.

(2) After an excavator has notified the appropriate one-call notification center of a proposed excavation, an owner of an underground facility shall:

(a) provide the locates and mark the location within 2 business days; or

(b) respond immediately if the excavator notifies the one-call notification center that an emergency exists.

(3) (a) After an owner of an underground facility has located and marked the underground facilities, the excavator shall determine if weather, time, or other factors may have affected location marks, warranting relocation of the facilities.

(b) If excavation has not occurred within 30 days of the locate and mark, the excavator shall request that the facility be relocated and remarked before excavating unless other arrangements have been made with the underground facility owner. The excavator is responsible for costs associated with relocating and remarking a facility that is not excavated within 30 days of the locate and mark.

(4) Upon receipt of the notice provided for in this section, the owner of the underground facility shall provide the excavator with reasonably accurate information as to the owner's locatable underground facilities by surface locating and marking the location of the facilities. If there are identified but unlocatable underground facilities, the owner of the facilities shall provide the excavator with the best available information as to their locations. An excavator may not excavate until all known facilities have been located and marked. An excavator is not responsible for damages to an underground facility that cannot be located by its owner. Once the facilities are located and marked by the facility owner, the excavator is responsible for maintaining the markings.

(5) Upon receipt of notice from the excavator, the facility owner shall respond within 2 business days by locating and marking the facility or by notifying the excavator that locating and marking is unnecessary. An

excavator may not begin excavating before the locating and marking is complete or before the excavator is notified that locating and marking is unnecessary.

(6) An excavator shall locate and mark the area to be excavated if requested by the facility owner or the owner's representative. If an excavator discovers an underground facility that has not been located and marked, the excavator shall stop excavating in the vicinity of the facility and notify the facility owner or the one-call notification center.

13.    Mont. Code Ann. § 69-4-505 provides in pertinent part:

(1)(a) If any underground facility is damaged by an excavator who has failed to obtain information as to its location as provided in 69-4-503, then the excavator is liable to the owner of the underground facility for the entire cost of the repair of the facility . . .

(2) Payment of costs and fees described in this section is due within 30 days of billing by the owner of the underground facility. The underground facility owner may enforce collection in a court of competent jurisdiction.

(3) If information requested pursuant to 69-4-503 is not provided within the time specified in that section, excavators damaging or injuring underground facilities are not liable for that damage or injury, unless

19

caused by their negligence . . .

(4) The act of obtaining information as required by this part does not excuse an excavator making any excavation from doing so in a careful and prudent manner, nor does it excuse the excavator from liability for any damage or injury resulting from the excavator's negligence.

14.     JU called in a valid ticket, the JU Ticket, to the one-call notification center on July 17, 2013. This ticket complied with the requirements of Mont. Code Ann. § 69-4-503, in that it described the location of work and provided notice to facility owners of the impending work.

15.     The JU Ticket covered the Damage Location between Anderson Road and Highline Road. The JU ticket directed facility owners to mark their facilities beginning 4,000 feet north of the intersection of Norris Road and Churchill Road, and to continue 4,000 feet from that intersection. Rainor Kjelsrud confirmed this interpretation of the Location of Work in the JU Ticket and the Court agrees that description of the Location of Work in the JU Ticket satisfied the notice requirements of Mont. Code Ann. § 69-4-503(1).

16.     Malin apparently misunderstood the description of the Location of Work in the JU Ticket. As a result of this apparent misunderstanding, Malin did not properly perform locating services in response to that ticket within two business days after AT&T received it, as required by Mont. Code Ann. § 69-4-503(5).

17.    Malin's violation of Mont. Code Ann. § 69-4-503(5) establishes negligence per se on the part of AT&T.

18.    Further, Malin's practice of marking only perceived potential conflict areas proved problematic and not reasonable in this instance. Malin also failed to heed the information provided by JU's work crew on July 24, 2013, that JU intended to excavate in the Damage Area.

19.    AT&T failed to act as a reasonable facility owner would have acted under similar circumstances. AT&T should have responded to any perceived ambiguity in the description of the Location of Work in the JU Ticket by seeking clarification from JU. JU's work crew provided Malin with this clarification on July 24, 2013, when they informed Malin that JU intended to excavate in the Damage Area.

20.    AT&T's failure to adequately mark the location in response to the one-call ticket gives rise to liability. *See, e.g., Mills v. Mather*, 890 P.2d 1277, 1283-84 (Mont. 1995) (holding that failure to act can form the basis for a negligence claim). This failure contributed to the damages to AT&T's underground facility.

21.    Under Mont. Code Ann. § 69-4-505(3), JU would not be liable for having damaged AT&T's facilities because AT&T failed to respond properly to the JU Ticket. This outcome assumes that JU did not act negligently in the

performance of its work at the Damage Location.

22.    It appears, however, that JU violated the provisions of Mont. Code Ann. § 69-4-503, when it proceeded with its excavation in the face of confusing markers at the Damage Location.

23.    Based on evidence presented during trial, the excavation crew of Notarius and Sven Kjelsrud likely encountered a combination of new and old markers at the Damage Location. These new and old markers likely arose from earlier work on the Pauley Ticket and Malin's more recent efforts on the JU Ticket. The Pauley markings were over a month old at the time and should have been relocated and remarked, as required by Mont. Code Ann. § 69-4-503(3)(b).

24.    Further, under Mont. Code Ann. § 69-4-503(3)(a), JU possessed responsibility to determine whether "weather, time, or other factors may have affected location marks, warranting relocation of the facilities."

25.    Mont. Code Ann. § 69-4-503(6), required JU to "stop excavating in the vicinity of the facility and notify the facility owner or the one-call notification center," when the excavation crew "discover[ed] an underground facility ha[d] not been located and marked." A reasonable operator under these circumstances would have stopped when it suspected that an underground facility had not been properly located and marked.

26.    JU's violations of Mont. Code Ann. § 69-4-503 establish negligence

per se.

27.    JU failed to act as a reasonable operator would have acted under similar circumstances. A reasonable operator would have stopped its work once it encountered the confusing flags. A reasonable operator would have sought clarification as to the meaning of the confusing flags. JU instead unreasonably chose to act as "go-getters" and to continue its excavation.

28.    JU proceeded to plow in spite of the possibility that the facilities were not properly marked. This action gives rise to liability. An analogous situation arose in *Okland v. Wolf*, 850 P.2d 302, 307 (Mont. 1993). There the court imposed 50 percent liability on a driver who operated his car in his own lane of travel at a lawful speed, but failed to keep a lookout for a bicyclist entering the street from an alley. The driver agreed that he could have seen a substantial part of the alley from where the out-of-control bicyclist was coming. The driver failed to see the out-of-control bicyclist, however, due to the fact that he and the passenger were chatting and as a result he took evasive action too late. *Id.*; *see also Sorrells v. Ryan*, 281 P.2d 1028, 1030 (Mont. 1955) (highlighting the fact that a pedestrian illegally crossing the street outside of a crosswalk did not absolve a driver from the duty to exercise reasonable care to avoid injuring the pedestrian). JU's actions in proceeding to excavate in the face of the confusing flags violated the Montana Dig Law and contributed to the damages sustained by AT&T to its underground

facility.

29.     It appears that both parties acted unreasonably in this case and these actions rise to per se negligence under the Montana Dig Law.

30.     The repairs that Fiberline, Inc. actually made to AT&T's damaged cable met industry standards and were sufficient to repair the damaged cable.

31.     Mont. Code Ann. § 69-4-505, limits AT&T's recoverable damages to the entire cost of repair.

32.     The total Fiberline repair expenses related to the cable strike were $206,066.

33.     AT&T produced a bill for the material cost of the replaced cable in the sum of $31,405.

34.     AT&T failed to provide sufficient evidence to support replacement of the entire 30,208 foot segment of cable. The record demonstrates that the repairs performed by Fiberline, including the use of the approximately 10,000 foot cable and the addition of the seventh splice, met AT&T's operating requirements and specifications, including attenuation specifications. As a result, AT&T's total recoverable damages proved at trial stands at $237,471.00.

35.     The Court determines that JU's negligence in proceeding to excavate in the face of the confusing flags at the Damage Location leaves them liable for 65% of the damages. The Court determines that AT&T bears responsibility for

35% of the damages based on its failure to take reasonable steps to clarify the work location described in the JU Ticket and failing to heed the information provided to Malin by JU's work crew that JU intended to excavate in the Damage Location.

36. The Court apportions greater liability to JU to reflect the unreasonableness of JU's decision to proceed with its excavation in the face of the confusing flags in the Damage Location. *Okland*, 850 P.2d at 307. A few telephone calls by JU to seek clarification of the location of the AT&T and CenturyLink underground facilities could have avoided the problem entirely. JU's breach of its duty to avoid existing underground facilities outweighs AT&T's breach of its duty to properly mark the location of its underground facilities.

37. AT&T seeks an award of prejudgment interest against JU. Mont. Code Ann. § 27-1-210 and § 27-1-211, provide for an award of prejudgment interest under certain circumstances. In general, the two statutes require that the party must be seeking damages that are capable of being made certain by calculation. *Mont. Petroleum Tank Release Comp. Bd. v. Crumleys*, Inc., 174 P.3d 948, 965 (Mont. 2008).

38. Unlike a personal injury case where the amount of damages remains uncertain until a jury makes an award, AT&T's damages could be calculated. AT&T undertook repair activities immediately after JU damaged its cable. AT&T attempted unsuccessfully to notify JU of it claim for $253,279.34 in its letter of

July 10, 2015. AT&T filed this action on July 27, 2105.

39.     AT&T attempted to calculate its damages on the actual cost of repair of its cable. AT&T admittedly included in its claim the $2,500 spent by Fiberline to repair a damaged splice vault box unrelated to JU's negligence. In fact, JU's retained expert, Vernan Hogge, attested to the reasonableness of AT&T's repairs.

40.     AT&T's initial claimed amount of $253,279.34 further comports with the Ninth Circuit's analysis of Montana law in *Transamerica Premier Ins. Co. v. Miller*, 41 F.3d 438 (9th Cir. 1994). The Court affirmed an award of pre-judgment interest even though the prevailing party could not establish a damages amount until the date of the amended judgment. The Court noted that the ability to calculate the damages to make an "appraisal" of damages possible satisfied the requirements of Mont. Code Ann. § 27-1-211. *Transamerica Premier*, 41 F.3d at 446, citing *Northern Montana Hosp. v. Knight*, 811 P.2d 1276, 1282 (Mont. 1991).

41.     By contrast, the Court in *Jim's Excavating Services, Inc. v. HKM Associates*, 878 P.2d 248 (Mont. 1994), denied prejudgment interest where a contractor failed to offer evidence before trial regarding how it intended to calculate damages caused by delays and extra work on a project. The court further noted that the contractor sought $510,899.00 damages at trial, but the jury awarded only $381,000.00. *Id.* at 261.

42.     AT&T admittedly requested more at trial than the Court has awarded.

26

Much of this discrepancy arises from AT&T's claim for the cost of replacing the entire 30,208 foot section of cable as opposed to the repairs actually undertaken. No doubt existed, however, that the parties could calculate the cost of the various repair options.

43.    The remaining discrepancy in AT&T's claimed amount and the amount awarded by the Court results from AT&T's comparative negligence. This issue proves problematic for AT&T. The court in *McPherson v. Schlemmer*, 749 P.2d 51 (Mont. 1988), affirmed the denial of prejudgment interest based on the fact that "no monetary obligation existed until the jury determined the degree of comparative negligence." *McPherson*, 749 P.2d at 54. The court reasoned that no monetary obligation would have existed on the part of the defendant if the jury had found the plaintiff 50 percent negligent or more. *Id.* The jury apportioned the plaintiff's liability at 30 percent. *Id.*

44.    JU contested liability in its answer and at trial. JU defended, in large part, based on its claim that AT&T had failed to comply with the marking requirements of the Montana Dig Law. No monetary obligation existed for JU until the Court determined the degree of comparative negligence, if any, on the part of AT&T, under the reasoning of *McPherson*. AT&T's claim for prejudgment interest must fail as a matter of law.

## JUDGMENT & ORDER

45.    The Court hereby renders judgment for AT&T.

46.    The Court orders that AT&T recover damages from JU in the sum of $154,356.15.

47.    The Court further orders that each party shall bear its own costs and attorney's fees.

48.    The Court further orders that AT&T recover from JU post-judgment interest on the full amount of the judgment at the annual rate of 10% accruing from the date that the judgment is entered. Mont. Code. Ann. § 27-1-210. Prejudgment interest is not available because damages were not certain until this judgment. Mont. Code. Ann. § 27-1-211.

49.    This judgment is final and disposes of all claims and all parties and is appealable.

50.    Pursuant to Fed. R. Civ. P. 58, the Court orders that the Clerk of Court enter judgment by separate document according to the terms outlined above. The Clerk of Court shall notify the parties of the making of this order.

DATED this 24th day of May, 2017.

Brian Morris
United States District Court Judge